**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

UNITED STATES OF AMERICA,

                   Plaintiff,

v.

JEREMY JOHN HALGAT,

                   Defendant.

Case No. 2:16-cr-00265-GMN-CWH

**REPORT AND RECOMMENDATION**

Before the court are Jeremy John Halgat's Motion to Dismiss for Outrageous Government Conduct and/or Pursuant to the Court's Supervisory Powers (ECF No. 864), filed August 13, 2018, the government's response (ECF No. 1192), filed September 27, 2018, and Halgat's reply (ECF No. 1266), filed October 11, 2018.

Defendants Perez, Morales, Henderson, Garcia, Palafox, Coleman, Neddenriep, Davisson, and Voll moved to join the motion.  (ECF Nos. 902,914, 937, 956, 986, 1013, 1027, 1053, 1079).

Garcia, Henderson, Coleman, and Voll also moved to join Halgat's reply. (ECF Nos. 1286, 1296, 1302, 1315).

## I.    BACKGROUND

On June 14, 2017, a federal grand jury seated in the District of Nevada, returned a superseding criminal indictment charging defendant Halgat with Conspiracy to Participate in a Racketeering Enterprise, in violation of Title 18, United States Code, 1962(d), (Count One); Conspiracy to Possess with Intent to Deliver a Controlled Substance, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), (Count Eleven); and Using and Carrying a Firearm During and In Relation to Crime of Violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(I) (Count Twelve).  (Superseding Indictment (ECF No. 13).)

Before the current indictment was returned, Halgat had faced charges in two prior indictments. First, in *United States v. Halgat, et al.*, 2:13-cr-00239-JAD-PAL, Halgat was charged with conspiracy to possess with intent to deliver a controlled substance, from February 22, 2013 to March 2, 2013, and use and carrying a firearm in furtherance of that crime. These allegations are the same allegations contained in counts eleven and twelve of the current indictment. *See* Superseding Indictment (ECF No. 13).

Second, in *United States v. Halgat, et al.*, 2:13-cr-00241-APG-VCF, Halgat was charged with four instances of distribution of cocaine on September 19, 2012, and October 11, 12, 26, 2012, as well as conspiracy to commit those offenses. These allegations are included in the list of overt acts in support of Count One, the RICO violation, of the current indictment. *Id.* at 28-29 (Overt Acts 59, 60, 62, 64, 65).

In both previous cases, Halgat moved to dismiss on precisely the same bases as the current motion, that is, outrageous government conduct. The assigned district judges jointly conducted a three-day evidentiary hearing to address the motion, and independently issued rulings which denied the motions. (*See* Order (ECF No. 290) in 2:13-cr-00239-JAD-PAL, attached as Ex. 1; Order (ECF No. 179) in 2:13-cr-00241-APG-VCF, attached as Ex. 2.) While Halgat was awaiting trial, both previous cases were voluntarily dismissed without prejudice by the government after the current indictment was returned.

Halgat now moves to dismiss the allegations against him based upon outrageous government conduct and pursuant to the court's supervisory powers. In furtherance of judicial economy, he incorporates "all docket entries" from the previous cases, as well as the arguments he made in those cases. He provides no new facts or arguments, but he updates some legal citations in previous motions.

The government responds that Halgat fails to provide points and authorities in support of his motion to dismiss the current RICO allegations, the doctrine of issue preclusion bars his motion, and the facts fail to meet the required standard to demonstrate outrageous government conduct.

1    Halgat replies that he is simply advancing the same arguments as outlined in Judge

2    Ferenbach's report and recommendation for dismissal in case number 2:13-cr-00241-APG-VCF,

3    that he provided ample points and authorities addressing the dismissal of the overt acts contained

4    in Count One, and to the extent the court seeks additional authority, he cites cases standing for the

5    proposition that two or more acts are required to show a pattern of racketeering.

6    **II.    ANALYSIS**

7    **A.  Failure to provide points and authorities as to Count One**

8    Count One charges Halgat with Conspiracy to Participate in a Racketeering Enterprise,

9    which contains 103 overt acts.  The previous two indictments that were dismissed did not contain

10    a racketeering allegation.  Although he mentions a few cases regarding racketeering, Halgat

11    provides no legal analysis supporting dismissal of Count One even if the overt acts with which he

12    is accused were dismissed.  Failure to provide points and authorities constitutes consent to denial

13    of a motion.  *See* LCR 47-3.  Accordingly, the court will recommend denial of the motion as to

14    Count One.

15    **B.  Issue Preclusion**

16    Although he incorporates all docket entries from the previous cases, Halgat does not

17    mention in his motion that the district judges assigned to the previous cases had jointly conducted

18    a three-day evidentiary hearing and issued decisions denying the motion to dismiss for outrageous

19    government conduct that is now before the court.  The government argues that the doctrine of

20    issue preclusion bars Halgat's request to dismiss Counts Eleven and Twelve, noting that the

21    motion contains no new analysis or arguments demonstrating why Judges Dorsey's and Gordon's

22    findings should be overturned.  Halgat replies that decisions of district judges are not binding on

23    other district courts.

24    Issue preclusion, or collateral estoppel, "means that when an issue of ultimate fact has

25    once been determined by a valid and final judgment, that issue cannot again be litigated between

26    the same parties in any future lawsuit."  *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356

27    (2016) (quotation omitted).  Issue preclusion applies to criminal prosecutions and civil

28    proceedings.  *Id.*; *United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008).  "Dismissal without

1  prejudice is generally not considered an adjudication on the merits of a controversy, and

2  therefore, is not entitled to issue preclusive effect."  8 James Wm. Moore et al., *Moore's Federal*

3  *Practice* ¶ 132.03[2][l][i] (3rd ed. 2011); *In re Duncan*, 713 F.2d 538, 544 (9th Cir. 1983) (same).

4  Here, the government dismissed without prejudice the previous two cases against Halgat

5  because it had indicted Halgat in the present case.  The issues that were litigated in those cases

6  regarding outrageous government conduct that Halgat seeks to revive in this case did not play a

7  role in ultimate dismissal without prejudice of the cases.  Nor were Judge Gordon and Judge

8  Dorsey's orders final, appealable judgments.  *See Bhatia*, 545 F.3d at 759 ("[g]enerally, denials of

9  pre-trial motions are not considered final, appealable judgments . . . ."); *cf. Duncan*, 713 F.2d at

10  542 (finding that substantive denial of a petition for naturalization has the same preclusive effect

11  as judgments in other judicial processes, even though the order stated it was without prejudice for

12  the alien to re-petition for naturalization).  Thus, the lack of a final judgment in the previous two

13  cases that depended on Judge Gordon and Judge Dorsey's orders regarding outrageous

14  government conduct forecloses the application of the issue preclusion doctrine.

15  Practically speaking, while it bears a new case number and was assigned to new judges,

16  this case is in many respects a continuation of the previous two cases that were dismissed without

17  prejudice.  This case involves the same parties.  The charges from the indictment in Judge

18  Dorsey's case are the same charges in Counts Eleven and Twelve in this case.  Some allegations

19  from Judge Gordon's case are re-alleged as overt acts in support of Count One in this case.

20  Halgat has incorporated by reference the motion, arguments, and exhibits from the previous cases

21  into the present case, and he provides no new facts or arguments.  As such, he asks for the same

22  relief based on motions that were decided and denied by both Judge Gordon and Judge Dorsey.

23  Their orders were comprehensive and explained in detail the decision to deny the motions to

24  dismiss, based on the law and the evidence received during a three-day evidentiary hearing in

25  which Halgat had a full and fair opportunity to litigate the issues contained in the motions.  Judge

26  Dorsey and Judge Gordon's orders leave no doubt as to the intention of the court.  Thus, it

27  appears Judge Dorsey and Gordon's orders arguably could be regarded under the preclusive

28  doctrine of law of the case.

"Under the law of the case doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). "A court may have discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* Law of the case is a prudential doctrine recognizing the general practice of refusing to reopen matters that have been decided. *Id.; Mayweathers v. Terhune*, 136 F. Supp. 2d 1152, 1154 (E.D. Cal. 2001); *see, e.g.*, *Loera v. U.S.*, 714 F.3d 1025, 1028-31 (7th Cir. 2013) (explaining the related doctrines of issue preclusion and law of the case in the criminal context).

While courts do not lightly ignore rulings made after opportunity for a full and fair hearing in a later stage of the same proceeding, because the law of the case doctrine is outside the parties' arguments and this case is a resumption of the previous cases, rather than the identical case, the court will not apply the doctrine. Regardless, because Halgat moves to incorporate all docket entries and the arguments he raised in the previous cases, the court finds itself in the unusual position of having to look to the previous cases that were dismissed without prejudice for the arguments, legal authority, and evidence necessary to resolve the motions that Halgat now seeks to renew. Thus, the court will consider the arguments and evidence raised in the previous cases on the merits.

## C. Review on the Merits

The court has reviewed all of the materials that Halgat moves to incorporate by reference, including all of the docket entries in the previous cases as well as the transcripts from the evidentiary hearing and the legal analyses of Judges Gordon and Dorsey. The court's review and consideration of the arguments and evidence in the previous cases leads this court to agree with their findings and incorporate them as its own recommendation. The hearing was thorough and addressed the issues presented by Halgat's motion, who had an opportunity to cross-examine, and Halgat did not request an additional hearing. The courts found that none of the charges against

Halgat should be dismissed based upon outrageous government conduct, or pursuant to the court's supervisory authority. Considering all of the information provided in prior cases, which Halgat has incorporated as his argument, the court recommends that the current motion to dismiss for outrageous government conduct be denied.

### D. Motions to Join

Defendants Perez, Morales, Henderson, Garcia, Palafox, Coleman, Neddenriep, Davisson, and Voll moved to join the motion. Although the co-defendants seeking joinder claim they are "similarly situated," they fail to provide any further analysis, and so the court has little basis to evaluate the motions. *See Tatung Co., Ltd v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1151-52 (C.D. Cal. 2016) (finding joinder should occur when a movant articulates how and why they are similarly situated to the motion they seek to join such that filing an independent motion would be redundant).

Regardless, because the government does not oppose the joinder of defendants who are charged in count one, their motions are granted.

Halgat is the only defendant charged in counts eleven and twelve, and so joinders to the motion to dismiss those counts by other defendants are denied because they have no standing to object.

### III.    CONCLUSION AND RECOMMENDATION

IT IS THEREFORE RECOMMENDED that Jeremy John Halgat's Motion to Dismiss for Outrageous Government Conduct and/or Pursuant to the Court's Supervisory Powers (ECF No. 864) be DENIED.

IT IS ORDERED that defendants Perez, Morales, Henderson, Garcia, Palafox, Coleman, Neddenriep, Davisson, and Voll's motions to join the motion (ECF Nos. 902, 914, 937, 956, 986, 1013, 1027, 1053, 1079), and Garcia, Henderson, Coleman, and Voll's motions to join Halgat's reply (ECF Nos. 1286, 1296, 1302, 1315) are GRANTED as to the motion to dismiss portions of count one, but DENIED as to counts eleven and twelve.

/ / /

/ / /

IV.    **NOTICE**

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: December 26, 2018

_____
C.W. HOFFMAN, JR.
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

         Plaintiff,

vs.

JEREMY HALGAT, et al.,

         Defendants.

Case No.: 2:13-cr-00239-JAD-PAL

**Order Denying Motions
to Dismiss Indictment**

     In *United States v. Black*, the Ninth Circuit explored the law-enforcement tactic known as the reverse-sting operation to determine if the indictment of defendants recruited from poor neighborhoods to carry out an armed robbery of a fictional stash house, under parameters set entirely by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), was the product of outrageous government conduct.[1]  Although "the government created the proposed crime, [and] initiated contact with the defendants" with no individualized suspicion or knowledge about their criminal histories, the *Black* court concluded that the totality of the circumstances fell short of demonstrating conduct "so grossly shocking and so outrageous as to violate the universal sense of justice."[2]

     It is the *Black* principles under which I must now evaluate Jeremy Halgat and Anthony McCall's requests to dismiss the gun and drug charges stemming from their armed assistance in the transfer of 10 kilograms of pure cocaine from plane to truck at a remote airstrip outside of Las

---

[1] *United States v. Black*, 733 F.3d 294 (9th Cir. 2013), *cert. denied sub nom. Mahon v. United States*, 135 S. Ct. 266 (2014) (mem.), *Timmons v. United States*, 135 S. Ct. 105 (2014), and *Alexander v. United States*, 135 S. Ct. 275 (2014) (mem.).

[2] *Black*, 733 F.3d at 298, 302 (quoting *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011)).  Ninth Circuit panels have since relied on *Black* to reject challenges of reverse-sting indictments arising from fictional drug operations. *See, e.g.*, *United States v. Dunlap*, ---F. App'x---, 2014 WL 6807733, at *1 (9th Cir. Dec. 4, 2014); *United States v. Sangalang*, 580 F. App'x 597, 599 (9th Cir. June 26, 2014) (affirming gun and drug convictions arising out of stash-house sting operation); *accord*, *United States v. Velasquez Lopez*, ---F. App'x---, 2014 WL 6953965, at *1 (9th Cir. Dec. 10, 2014) (same).

1  Vegas. Jeremy "Maniak" Halgat and Anthony "Uncle Tony" McCall[3] believed they were providing

2  armed security and assistance to one of their "brothers" in the Vagos motorcycle organization who

3  was a drug courier for a Mexican cartel and needed hired guns to watch his back while he took

4  delivery of the cocaine and stashed it in his truck for cross-country transport. In actuality, however,

5  this "brother" was ATF task force officer (TFO) Agostino Brancato, who had gone under deep cover

6  to infiltrate the Vagos organization. Halgat and McCall argue that, "[r]ather than infiltrating an

7  existing drug conspiracy or criminal organization engaged in ongoing criminal activity, the

8  government created, invented, and imagined up crimes for the[se] defendants to be induced and

9  entrapped into committing for the purpose of charging members of . . . Vagos . . . with drug and gun

10  crimes."[4] They decry their ensnarement as conscience-shocking, and they move to dismiss their

11  indictments under a due-process theory and, alternatively, under the court's supervisory powers.[5]

12  Defendants rely heavily on the robust criticisms of the reverse-sting model voiced by the

13  dissenters in *Black* and in United States District Judge Otis Wright's dismissal of a stash-house-

14  robbery-sting indictment in *United States v. Hudson*—a dismissal reversed on appeal last month.[6]

15  And they emphasize Magistrate Judge Cam Ferenbach's recommendation that United States District

16  Judge Andrew Gordon dismiss the conspiracy and distribution charges against Halgat in a separate

17  but concurrently filed indictment (2:13-cr-00241-APG-VCF) for selling TFO Brancato a quarter

18  pound of cocaine over four transactions during the autumn months preceding the airstrip sting

---

[3] Doc. 283 at 99.

[4] Doc. 188 at 5.

[5] Docs. 188, 205. Halgat originally raised two grounds for dismissal under the court's supervisory authority: falsified reports of investigation (ROIs) and agent tampering with audio recordings. Doc. 188 at 33–39. The defendants stipulated to withdraw their audio-file tampering argument during the evidentiary hearing. *See* Doc. 277; Doc. 284 at 5–11. I hereby approve the stipulation (Doc. 277) and defendants' withdrawal of this portion of their respective motions.

[6] Doc. 188 at 14–16 (citing *United States v. Hudson*, 3 F. Supp.3d 772 (C.D. Cal. 2014), *rev'd*, *Dunlap*, 2014 WL 6807733, at *1; *Black*, 733 F.3d at 313 (Noonan, J., dissenting); 750 F.3d 1053, 1055 (2014) (Reinhardt, J., dissenting from order denying petition for rehearing en banc)).

1   operation.[7]

2       On Halgat's request,[8] and because the arguments impugn Brancato's credibility and rest on

3   conflicting transcriptions of the (often poor quality recordings of) conversations between the agent

4   and the defendants,[9] Judge Gordon and I held a three-day evidentiary hearing.[10]  The parties played

5   and re-played audio recordings of the key undercover conversations, evaluated them against the

6   competing transcriptions of the same events, and showed the video recordings of the planning

7   meetings between the TFO and the defendants for the airstrip transaction and a four-camera video

8   recording of the operation itself.  TFO Brancato testified for the bulk of those three days, offering his

9   eyewitness account of the events and explaining his actions, reports, and statements in response to

10  questions by defense counsel, the government, and the bench.[11]

11      Having fully considered the evidence presented at the three-day evidentiary hearing, the

12  parties' extensive briefing, and the totality of the circumstances in light of *Black*, I find that the

13  government's conduct does not reach the "extremely high standard" necessary to dismiss this

14  indictment for outrageous government conduct, I find no reason to exercise my supervisory powers

15  to dismiss the indictment, and I deny the motions to dismiss.

16

17  ——————————

18  [7] Doc. 217-1. Magistrate Judge Ferenbach did not hold an evidentiary hearing. *See id.* at 2 (vacating the hearing). His report and recommendation was provided to Judge Gordon and focuses on (and

19  thus recommends dismissal of) only Halgat's indictment in 13-cr-241. Although the instant motion is nearly identical to the one filed in the case before Judge Gordon, it was not referred to a magistrate

20  judge for report and recommendation.

21  [8] *See* Doc. 188 at 43.

22  [9] *Cf. United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (recognizing that an evidentiary

23  hearing on a motion to suppress is necessary when contested issues of fact exist).

24  [10] *See* transcripts at Docs. 281–84. Due to the overlap in the motions filed by Halgat in his cases

25  before Judge Gordon and me, and in the interest of judicial economy and to prevent the receipt of potentially inconsistent evidence, Judge Gordon and I conducted this hearing jointly. The parties

26  stipulated to this procedure. *See* Doc. 281 at 5–7.

27  [11] Docs. 281-84. Testimony was also provided by case agents Matthew Wear and David Arboreen

28  on the limited topic of the procedures for preserving undercover audio recordings. *See* Doc. 284 at 14–35.

**Discussion**

**A.     Background**[12]

     **1.     Operation Pure Luck**

     In August 2011, the ATF initiated an undercover investigation into the Vagos motorcycle organization to determine if it is a criminal organization and whether any of its members are engaged in criminal conduct.  Doc. 283 at 92.  It took Los Angeles County Sheriff's Deputy and ATF Task Force Officer Agostino Brancato nearly a year—acting in an undercover capacity with the initial assistance of a confidential informant—to move through the Vagos ranks from "hang around," to "prospect," and ultimately to"full-patch-member" status.  Doc. 281 at 41–42.  Jeremy Halgat and Anthony McCall were members of separate Vagos chapters in Southern Nevada, and Halgat held various offices in the organization.  Doc. 283 at 100–01, 114–15.

     **2.     Jeremy Halgat**

     TFO Brancato met Jeremy Halgat in September 2011, but Halgat did not become a target in Operation Pure Luck until August 2012 when he brought Brancato with him to purchase $200 in cocaine from Udell Wickham, Halgat's co-defendant in the case before Judge Gordon.  Doc. 283 at 98, 109, 141–43.  Halgat shared the cocaine with other Vagos members the next day.  *Id.* at 146–50.

     But that was not the first drug activity Brancato had witnessed Halgat participate in.  On December 9, 2011, Brancato watched Halgat obtain an eighth of an ounce of cocaine and share it with other Vagos members.  *Id.* at 111–12.  And although Brancato observed that Wickham was a supply source for Halgat, Halgat also told Brancato that he had a supplier in Arizona but he was unsure of the quality of those narcotics and was positive that Wickham had a better product.  *Id.* at 144, 164.  On September 8, 2012, while sharing a room with Halgat on a Vagos trip, Brancato observed Halgat ingest cocaine.  *Id.* at 151–52.  Brancato purchased cocaine from Wickham through Halgat in four transactions during September and October 2012.  *Id.* at 180.

     Drugs were not the only illicit activity that Halgat purported to be involved in.  On December

---

[12] These factual findings are intended only for the limited purpose of resolving these motions to dismiss.

Page 4 of 20

17, 2011, Halgat boasted to Brancato that he had gone to a rival motorcycle club's clubhouse armed with a semi-automatic firearm "ready to take care of business," and he flashed his gun to Brancato. *Id.* at 120. Halgat told Brancato that he discharged a firearm at a New Year's Eve party and gifted the expended bullet casing to another Vagos member. *Id.* at 121. In January 2012, Halgat told Brancato that, during a shooting incident in September 2011 involving the Vagos and a Hell's Angels member in Sparks, Nevada, he "stomped a Hell's Angel member on the casino floor." *Id.* at 123; Doc. 284 at 87.[13]

On April 20, 2012, Halgat shared with Brancato that he had previous experience transporting marijuana across the border in hidden compartments in vehicles. Doc. 283 at 125. The next month, Halgat revealed to Brancato that, during his time as a drug courier, $35,000 in marijuana was stolen from him and he had a couple of "close calls with law enforcement." *Id.* at 129; Doc. 191-2 at 3 (ROI 119 dtd 5/29/12). Halgat repeatedly told the story that he was once stopped at the border with a never-detected crate of grenades between his legs. Doc. 283 at 129–30; Doc. 191-2 at 3 (ROI 119 dtd 5/29/12).

In May 2012, to mask the fact that he was actually out on leave and to avoid discipline because he was not performing his Vagos prospect duties, Brancato told Halgat that he had been robbed of $20,000 in methamphetamine while transporting drugs on the east coast. Doc. 283 at 130–32. Halgat responded by, *inter alia*, telling Brancato that Halgat himself is "a good gun," which Brancato took to mean that Halgat could help protect him from not getting robbed again. *Id.*; Doc. 191-3 at 2–3 (ROI 123 dtd 6/4/12). In a conversation on June 18, 2012, Halgat reminded Brancato of his experience as a drug courier and conveyed that his specialty was collecting drug debts. Doc. 283 at 135–36. He also boasted about intimidating a witness to prevent the witness from testifying in court, and he shared with Brancato the counter-surveillance techniques he was going to use to evade law enforcement. *Id.* at 134–35. Halgat also informed Brancato in July 2012 that he could convert an assault rifle into a fully automatic firearm. *Id.* at 136–37.

---

[13] Halgat had no criminal record; however, he displayed patches on his Vagos vest that signify he had been recognized by the organization as having committed an act of violence on behalf of the chapter and on behalf of the broader Vagos organization. Doc. 282 at 8–10; Doc. 283 at 116–18.

### 3. Anthony McCall

On March 26, 2012, McCall, Morrow, and other Vagos members gathered near a local bar where they understood another Vagos member was involved in an incident with a rival Hell's Angels member. *Id.* at 182–87. Although their backup ultimately was not needed, McCall told Brancato that he carried a firearm to that gathering and recognized that, as a convicted felon, he would face stiff penalties if found with a gun. *Id.* at 186. Nevertheless, McCall told the TFO, he also kept guns at his home. *Id.* at 186–87. Brancato later bought a personal-use quantity of steroids from McCall on July 13, 2012. *Id.* at 72–73, 140; Doc. 191-4 at 1 (ROI 152 dtd 9/5/12).

### 4. The Airstrip Sting Operation

In mid-November 2012, Brancato first generically mentioned to Halgat and McCall that he had an opportunity for them to earn some cash.[14] Halgat had already been informed of the TFO's alleged cartel connection. Brancato testified that neither Halgat (who had already been informed of the TFO's alleged cartel connection) nor McCall rejected the idea. Doc. 283 at 187–88.

After a Vagos meeting in the garage of the TFO's undercover house on February 8, 2013, Brancato laid out to McCall the full details of the opportunity he had for him. *Id.* at 79; Exh 680 (audio). He explained that he was connected to the Mexican drug cartel and he moved anywhere from 10 to 50 kilograms of pure cocaine each month to the east coast. He said he had an air shipment of cocaine coming in and needed three "armed" guys to watch his back while he took the delivery and to help him weigh the cocaine; he would pay $1,000 in cash. Doc. 283 at 190–191; Exh 680 (video). On the video recording of the conversation,[15] McCall and Brancato are easily visible and their conversation is mostly audible. McCall's body language, demeanor, and voice reflect unequivocally that he is enthusiastic and eager for the opportunity, and he quickly states, "I don't have a problem with that." Doc. 283 at 194; Exh 680. And when Brancato repeatedly made it

---

[14] Doc. 283 at 44–47, 73–74 (Brancato told McCall and Halgat, "I may have something coming up where I may need some help, I pay cash money."); Doc. 217-2 (ROI 187 dtd 12/4/12) at 3; Exh 642 (audio).

[15] Doc. 283 at 76; Exh 680 (video). The video was played for the court at the evidentiary hearing, and the witness was questioned about the events depicted.

1 known to McCall that the choice was McCall's, McCall eagerly responded that he was willing to

2 take a risk because he had already done prison time and was not afraid to go back to prison. Doc.

3 283 at 194; Exh 680.[16] He also stated that he was "not above taking some shipment" of cocaine

4 himself. Exh 680. Brancato testified that McCall did not appear scared or express any reluctance.

5 Doc. 283 at 193. Brancato told McCall that he wanted a third person of McCall's choosing; McCall

6 suggested Robert Morrow[17] and explained that he trusted Morrow for the job because Morrow had

7 once beaten someone to death. *Id.* at 199.

8     McCall, Morrow, and Brancato met in Brancato's garage on February 22, 2014. *Id.* at 196;

9 Exh 22 (video). This meeting, too, was video recorded, and the recording was shown at the

10 evidentiary hearing. Brancato first recounted to Morrow the details he had already shared with

11 McCall about the opportunity. *Id.* Halgat, whom Brancato had already fully briefed about the

12 opportunity, soon joined and sat at the head of the table. *Id.* at 187, 198. Halgat boasted to the group

13 that he had followed many cars to Los Angeles and other places to make sure they reached their

14 destination, and when Brancato asked Halgat if he possessed any firearms, he responded that he had

15 a pistol and a shotgun but no assault rifle, and he displayed a gun in his waistband. *Id.* at 200–01;

16 Exh 22 (video). McCall boasted that he is a "pretty good shot." Doc. 284 at 79. Morrow asked

17 Halgat if he wipes down his bullets before loading his gun; he responded essentially that he does

18 when he's going to commit a crime. Doc. 283 at 201–02. Halgat also explained that he had bought a

19 separate barrel for his semiautomatic firearm so he could switch it out and not have the ballistics

20 detected in the event he needs to use his gun. Doc. 284 at 36–38.

21     Halgat then interjected himself into the creative planning of the operation. Recognizing that

22 McCall may be concerned about having firearms in his own possession as a convicted felon, Halgat

23 offered to provide all the guns for the airstrip event. Doc. 284 at 39. Halgat then began to strategize

24 about tactical assault-type practice and the clothes they should wear ("nondescript clothing,

25 

---

26 [16] Although counsel for McCall suggested that McCall was intoxicated during this conversation, I do not find that the evidence supports the proposition that McCall was materially impaired.

27 

28 [17] Morrow entered a plea, judgment was entered against him, and he was sentenced in April 2014. Docs. 170, 175. Morrow is not participating in these motions.

1    obviously nothing green"—the signature Vagos hue); Halgat, McCall, and Morrow started

2    formulating a plan to scout out the location of the deal and prepare for it. *Id.* at 40–41; Exh 680

3    (video). Halgat regaled the group with stories of his having evaded law enforcement while

4    transporting a concealed box of grenades across the Mexican border and explained how his "guys"

5    usually bring a "black-out bag" with a few days' worth of clothes in case they need to disappear.

6    Doc. 284 at 42–43; Doc. 283 at 201. At no point in the discussion did Halgat, McCall, or Morrow

7    express any reluctance to participate in the opportunity Brancato was providing. Doc. 284 at 43.

8    And by this time, Brancato had "lost count" of how many times Halgat had told him he had

9    participated in drug-courier activities. Doc. 283 at 192.

10        The government then supplied that opportunity. Agents Brancato, Wear, and Arboreen

11    picked out an airstrip in Searchlight, Nevada, and provided Brancato with a truck with a secret

12    compartment. They borrowed 10 kilograms of cocaine from an evidence vault, placed it in a duffel

13    bag, and had another agent fly it to the airstrip in a Cessna airplane. Doc. 281 at 183–87; Doc. 283 at

14    83-84; Doc. 284 at 76–77; Exh 654.

15        Brancato asked Halgat, McCall, and Morrow to be at his undercover house by 9:30 a.m. on

16    March 2, 2013, and supplied a rental van for them to follow him to the airstrip in; the defendants

17    timely arrived independently, chose who among them had the cleanest driving record to drive the

18    van, loaded their guns into the van, and followed Brancato as he drove his truck. Doc. 284 at 44–47.

19        The multi-camera-view video recording of the airstrip sting operation—played in court with

20    additional narration by Brancato—depicts the March 2, 2013, events. It shows Halgat unpacking an

21    assault rifle from its case in the truck bed and moving it to the front passenger seat of the truck and

22    then taking a sentinel position by the open truck door. Doc. 283 at 28, 31–32; Doc. 284 at 51–53.

23    Morrow readied a shotgun and placed it in the back seat of the truck. Doc. 283 at 27. The plane

24    arrived, the duffel bag of cocaine was handed over to Brancato, and Morrow and McCall helped

25    Brancato weigh the bricks of cocaine and wrap them with fabric-softener sheets that Brancato had

26    supplied. *Id.* at 32–36.

27        Once the drugs were safely loaded in the truck's secret compartment, Halgat and McCall

28    gathered up the guns from the truck and put them back in their cases. Doc. 283 at 36; Doc. 284 at

1    54–55.  All three defendants then left Brancato, returned the guns to their vehicle, and drove back to

2    Las Vegas.  Doc. 283 at 36–37.  Brancato testified that at no time did any of the defendants express

3    to him that they did not want to go forward with the operation.  Doc. 284 at 55.  Brancato described

4    their demeanor as "casual," and the video images support that characterization.

5          On June 19, 2013, Halgat, McCall, and Morrow were indicted in this case on charges of

6    conspiracy to possess with intent to deliver the 10 kilograms of cocaine and using and carrying a

7    firearm in the commission of that crime.[18]

8    **B.     Legal Analysis**

9          **1.     Outrageous Government Conduct**

10         In *United States v. Russell*, the United States Supreme Court held that outrageous

11   government conduct occurs when the actions of law enforcement officers or informants are "so

12   outrageous that due process principles would absolutely bar the government from invoking judicial

13   processes to obtain a conviction."[19]  A dismissal of an indictment for outrageous government conduct

14   is rooted in the Fifth Amendment's Due Process Clause.[20]

15         The Ninth Circuit has recognized that dismissing an indictment for outrageous government

16   conduct is "limited to extreme cases" in which the defendant demonstrates that the government's

17   conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate

18   the universal sense of justice."[21]  This is an "extremely high standard."[22]  As the Ninth Circuit panel

19   remarked last year in *Black*, "Indeed, there are only two reported decisions in which federal appellate

---

21   [18] Doc. 1.  That same day, Halgat—along with Wickham—was separately indicted in the case now
22   pending before Judge Gordon on four counts of distributing cocaine and a single count of conspiracy
     to distribute cocaine, for the four cocaine transactions alleged in the Fall of 2012.  *See* 13-cr-241-
23   APG-VCF, Doc. 1.

24   [19] *United States v. Russell*, 411 U.S. 423, 431–32 (1973).

25   [20] U.S. Const. amend. V.

26
27   [21] *Stinson*, 647 F.3d at 1209 (quoting *United States v. Restiepe*, 930 F.2d 705, 712 (9th Cir. 1991)
     (internal quotation marks omitted)).

28   [22] *Black*, 733 F.3d at 302 (quoting *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)).

courts have reversed convictions under this doctrine."[23]

Because there is no bright-line rule to determine when law enforcement's conduct goes from acceptable to outrageous, each case must be resolved on its own facts, considering the totality of the circumstances.[24] The Ninth Circuit has provided six factors to guide district courts in this analysis:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and the necessity for the actions taken in light of the nature of the criminal enterprise at issue.[25]

I consider these non-formalistic *Black* factors in turn to help me assess whether the government's conduct here was "so grossly shocking and so outrageous as to violate the universal sense of justice."[26]

### a. *Known criminal characteristics and individualized suspicion of the defendants*

Halgat and McCall argue that the first two *Black* factors weigh in their favor because neither defendant was engaging in criminal conduct when TFO Brancato infiltrated the Vagos motorcycle organization in early 2011.[27] This argument is myopic and factually inaccurate.

As the Ninth Circuit noted in *Black*, "The government need not have individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation."[28] It is enough that the government suspects a category of persons it has reason to believe are involved in a particular type of

---

[23] *Id.* at 302 (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)).

[24] *Id.* at 302, 304.

[25] *Id.* at 303.

[26] *Id.* at 310 (quoting *Stinson*, 647 F.3d at 1209).

[27] *See* Doc. 188 at 25.

[28] *Black*, 733 F.3d at 304 (citation omitted).

1  criminal activity.[29] The Operation Pure Luck investigation was not focused on Halgat or McCall; its

2  target was more broadly the Vagos motorcycle organization.[30] Thus, it is not dispositive that the

3  government lacked individualized suspicion of Halgat or McCall in early 2011 when the Vagos

4  organization was first infiltrated and the investigation began. Indeed, in *United States v. Bagnariol*[31]

5  and *United States v. Emmert*,[32] the Ninth Circuit rejected the defendants' outrageous-government-

6  conduct claims where groups were broadly targeted and individualized suspicion was only later

7  developed.

8          The more salient inquiry is whether the government had reason to suspect Halgat and McCall

9  "before initiating [this] sting operation."[33] The record from the evidentiary hearing sufficiently

10  established that law enforcement had individualized suspicion of McCall and Halgat before Brancato

11  proposed the airstrip cocaine transaction (first vaguely) in November 2012 and (later with full

12  specificity) in February 2013. Brancato had observed Halgat purchase and use cocaine on a number

13  of occasions, Halgat had demonstrated a more intimate knowledge of the cocaine industry by

14  vouching for the quality of Wickham's narcotics over that of Halgat's other supplier in Arizona, and

15  Halgat had boasted to Brancato of his extensive drug-courier activities so often that Brancato lost

16  count. Halgat also had a large collection of firearms and had bragged to Brancato of his armed-

17  security skills.

18          McCall, too, had already demonstrated his willingness to engage in illicit activity. Testimony

19  at the evidentiary hearing revealed that McCall had supplied Brancato with steroids and had joined a

---

21  [29] *Id.*; *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993) (relying on *United States v.*
22  *Luttrell*, 889 F.2d 806, 811 (9th Cir. 1989), to hold that "lack of a reasoned ground for investigating"
    a defendant does not render government conduct unreasonable).

23  [30] Doc. 283 at 92.

24  [31] *United States v. Bagnariol*, 665 F.2d 877, 882 (9th Cir. 1981).

25  [32] *United States v. Emmert*, 829 F.2d 805, 811–13 (9th Cir. 1987).

26  [33] *Black*, 733 F.3d at 304 ("The government need not have individualized suspicion of a defendant's
27  wrongdoing before conducting an undercover *investigation*. Whether the government had reason to
    suspect an individual or identifiable group before initiating *a sting operation* is an important
28  consideration") (internal citations omitted) (emphasis added).

1    gathering of other Vagos members to provide armed backup to a new member who was involved in

2    an incident with a rival Hell's Angels member.  McCall was not shy about the fact that he often

3    carried a firearm and knew well that, as a convicted felon, he faced stiff penalties if his forbidden

4    firearms were ever discovered by law enforcement.

5         Thus, unlike in *Black*, where the government—without individualized suspicion of any

6    criminal histories or propensities—sent a confidential informant to a "'bad' area where persons

7    engaged in 'criminal activity' were likely to gather,"[34] the government had broad knowledge about

8    the Vagos operation and months of intelligence on Halgat and McCall's individual "criminal

9    inclinations [and] experiences" before setting the bait for this reverse-sting operation.  Here, law

10   enforcement did not "bait[] a pool of candidates" as it did in *Bagnariol* or "recruit from a more

11   generalized population" as in *Black*—tactics deemed "troubling" but still not categorically

12   outrageous by the *Black* court.  Instead, it offered the opportunity to provide armed assistance in a

13   cocaine-transfer operation to two individuals who had already made their histories and services well

14   known to TFO Brancato.  And, as the Ninth Circuit expressed in *United States v. So*, it is not

15   outrageous for the government to infiltrate a criminal organization, approach people "already

16   engaged in or anticipating a criminal activity," or provide "valuable and necessary items" to a

17   conspiracy.[35]

18        **b.      *The government's role in creating the crime of conviction, encouragement***
              ***of the defendants to commit the offense conduct, and participation in the***
19            ***crime***

20        There is no question that the government provided valuable and necessary items to this

21   conspiracy.  But the level of government involvement does not exceed that which fell short of the

22   conscious-shocking benchmark in *Black*.

23        The fictitious stash-house robbery reviewed in *Black* "was entirely the ATF's creation."[36]

24   _____

25   [34] *Id.* at 305.

26   [35] *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985) (citations omitted); *see also Hampton v.*
     *United States*, 425 U.S. 484, 489 (1976) (the government can act as both supplier and buyer in sales
27   of illegal goods without violating due process).

28   [36] *Black*, 733 F.3d at 305.

1  The agency sent a paid confidential informant to troll bars in "a bad part of town" to "try and find

2  some people that are willing to go commit a home invasion."[37]  Once he found them, the lead ATF

3  agent met with them "to determine whether or not they [we]re actually involved in that type of

4  crime" and to "provide details on the fictitious home invasion."[38]  The cover story the agent shared

5  with potential targets of this reverse-sting operation was that he "was a cocaine courier who

6  transported drugs for a group of Mexican drug dealers and was unhappy with the pay he was

7  receiving," so he was going to get retribution by robbing the dealers' cocaine stash house, which he

8  predicted would contain anywhere from 22 to 30 kilograms of cocaine and have at least one armed

9  individual guarding the drugs.  The agent "invented the scenario, including the need for weapons and

10 for a crew, and the amount of cocaine involved.  The only overt actions by the defendants involved

11 showing up at meetings, including arriving at the parking lot with four hidden, loaded weapons and

12 then driving to the storage warehouse where they were [ultimately] arrested."[39]  In sum, the *Black*

13 defendants "were responding to the government's script"[40] and "the government's role in creating the

14 crime of conviction was quite strong, raising concerns that it sought to manufacture a crime that

15 would not have otherwise occurred."[41]

16        The government's role in Halgat and McCall's crime was undeniably strong.  Brancato's

17 need for protection during the transfer of 10 kilograms of cocaine from plane to truck was entirely

18 fictitious: law enforcement proposed, created, and staged the entire transaction, from finding the

19 airstrip to supplying the plane, pilot, rental van, cocaine, and the truck with the secret compartment

20 to hide the drugs.[42]  Like the defendants in *Black*, Halgat and McCall responded to the government's

---

22  [37] *Id.* at 299.

23  [38] *Id.*

24  [39] *Id.* at 303.

25  [40] *Id.*

26  [41] *Id.* at 307.

28  [42] Doc. 281 at 182–87.  The courts of appeal have consistently recognized that a sting operation that involves "government creation of the opportunity to commit an offense, even to the point of

1    script *and* added details of their own.  As the video-recordings show, they attended planning

2    meetings, selected Morrow as the third participant, decided who would bring what firearms and who

3    would drive the rental van to the remote airstrip, and strategized about and chose their own clothing

4    for the event.  And on the day of the operation—as the multi-camera video recording of the event

5    and its audio (both played in court) and Brancato's related evidentiary-hearing testimony

6    revealed—they showed up at Brancato's undercover residence at the prearranged time, and they

7    determined how to ready themselves for the arrival of the plane, where to stand, what to do with the

8    guns they brought and controlled, and who would help Brancato weigh and wrap the drugs for

9    transport.

10            There is also at least one material difference between this scenario and the one in *Black*.[43]

11   Whereas the fictitious stash-house robbery was engineered by law enforcement agents before they

12   even met the *Black* defendants, this airstrip sting was not planned until Brancato got to know Halgat

13   and McCall.  And it might even be said that Halgat himself was the creative inspiration for this

14   reverse- sting operation and the resulting charged offenses because it was Halgat who repeatedly

15   boasted to Brancato about his drug-courier activities and his armed-protection services beginning in

16   May 2012—nearly 10 months before the reverse-sting operation.  Thus "the argument for

17

18   _____

19   supplying defendants with materials essential to commit crimes, does not exceed due process limits."
     *See, e.g.*, *United States v. Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013) (citation omitted), *cert. denied*,
20   135 S. Ct. 53 (2014) (mem.); *United States v. D'Antoni*, 874 F.2d 1214, 1220 (7th Cir. 1989) ("[T]he
     very fact the government may have supplied . . . an agent of the crime does not in itself constitute
21   outrageous governmental conduct."); *Twigg*, 588 F.2d at 380–81.

22   [43] One additional distinction is that, in *Black*, the government stopped short of going through with
23   the robbery itself, instead stopping the perpetrators en route and eliminating the need to follow
     through with the fiction it had designed for the defendants.  *See Black*, 733 F.3d at 301.  I do not find
24   this distinction material even though, in completing the fictitious plane-to-truck drug transfer in this
     case, the government necessarily participated more in this staged crime.  By the time the plane
25   arrived, the government had done no more than the agents in *Black*, and the defendants had
     responded as "readily and actively as willing participants with a professed ability to carry out" the
26   crime as the *Black* defendants did.  *Id.* at 302.  And by playing out the entire scenario, the
27   government added no material inducement; the defendants had demonstrated "the technical expertise
     [and] resources to commit" the crimes charged before the plane even landed.  *Id.* at 309 (citing
28   *Twigg*, 588 F.2d at 380–81).

                                          Page 14 of 20

1    government overreaching" has less force here than in *Black*.[44]

2          Concerns that the government manufactured a crime that otherwise would not have occurred

3    are also largely mitigated—as in *Black*—by Halgat and McCall's representations that they had

4    engaged in related criminal activity in the past and by their enthusiastic response to the fictional

5    drug-transaction proposal.[45]   Halgat made his extensive experience with drugs, guns, and violence

6    well known to Brancato, and when the full details of the proposal were laid out, Halgat boasted of

7    his similar escapades as a drug courier,[46] how he had purchased an extra barrel for his gun so the

8    bullets would be harder for ballistics experts to trace, and how he had a routine with his "guys" for

9    everyone to pack a bag of "nondescriptive clothing" for two or three days, just in case.[47]  As the

10   *Black* court observed, a defendant's "repeated representations" that he "engaged in related criminal

11   activity in the past quickly supplie[s] reasons to suspect [he is] more likely to" reoffend.[48]  McCall

12   eagerly jumped at the opportunity even if it resulted in a return to prison, recruited Morrow to join

13   the crew, and quickly volunteered also to carry a shipment or follow Brancato across the country as

14   backup.

15          And "there is no evidence that the government engaged in inappropriate activity, threats or

16   coercion to encourage defendants to engage" in this criminal activity.[49]  Brancato repeatedly told the

17   defendants that the choice was theirs.  The idea was initially floated past McCall and Halgat in

---

19   [44] *Black*, 733 F.3d at 305 (collecting cases in which courts have found no outrageous conduct when it
20   is the defendant who first broaches the subject of potential criminal activity).

21   [45] Nearly all of this was captured on video and viewed during the evidentiary hearing. *See id.* at 310
     ("[T]he existence of tape and video recordings to prove what was actually said and done has weighed
22   heavily in our review of the record.  We would be faced with a much different case if all we had to
     rely on was the credibility of the conflicting after-the-fact testimony of the government and defense
23   witnesses.").

24   [46] Whether Halgat was telling the truth or spinning tales, Brancato was entitled to rely on his
25   representations of past conduct. *See id.* at 307 n.10.

26   [47] Doc. 284 at 41.

27   [48] *Black*, 733 F.3d at 307.

28   [49] *Id.* at 308.

1    November 2012; few details were provided, and both men expressed interest despite the lack of

2    details. The proposal was revisited—with details—almost four months later in February 2013. The

3    defendants appeared in all respects (as depicted on video recordings) to be enthusiastic and eager to

4    participate in the opportunity. After viewing (and re-viewing) the events on video tape and with the

5    aid of Brancato's testimony, I would describe the government's conduct as encouragement without

6    pressure or coercion. And although the duration of the government's involvement in this crime may

7    span from mid-November 2012 through March 2, 2013, the November discussion was vague and

8    only used to test Halgat and McCall's interest; all material participation occurred in a less-than-one-

9    month time span.

10         Defendants argue that they were coerced and pressured by concerns about the safety of

11   Brancato—their friend and Vagos "brother," who repeatedly told them he needed armed backup so

12   he didn't end up in a barrel.[50] They suggest that it was outrageous to prey on these men's

13   compassion for this person whom they cared for and wanted to protect from the Mexican drug

14   cartel.[51] "To win a suspect's confidence," an undercover agent, like a confidential informant, "must

15   make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best

16   to establish a rapport with the suspect."[52] "The deceptive creation and/or exploitation of [even] an

17   intimate relationship does not exceed the boundary of permissible law enforcement tactics."[53]

18   _____

19   [50] Doc. 188 at 33–34.

20   [51] Id.

21   [52] United States v. Simpson, 813 F.2d 1462, 1466 (9th Cir. 1987).

22   [53] Id. Judge Ferenbach found in his report and recommendation in 13-cr-241-APG-VCF that this
     case is different from Simpson because, after the relationship of trust was established in Simpson, the
23   government set its bait and was immediately taken by the defendant "without further inducement
     by the government," whereas Halgat rejected Brancato's drug-trafficking opportunities and
24   "appeared resolute against trafficking drugs until Brancato exploited [his] socio-economic
     vulnerability." Doc. 217-1 at 29–31. I take no position on the government's encouragement of
25   Halgat's ounce-quantity cocaine transactions because this issue is before Judge Gordon, not me. But
     the evidentiary hearing record does not evince that Halgat's will was overcome by socio-economic
26   vulnerability in any way, and a $1,000 enticement is not conscience-shocking under Ninth Circuit
27   precedent. See, e.g., United States v. Emmert, 829 F.2d 805, 812 (9th Cir. 1987) (finding that
28   $200,000 "finder's fee" for arranging drug transaction was not outrageous as "large sums of money

1    Instructive is the Ninth Circuit's decision in *United States v. Smith*, in which the defendant argued

2    that infiltrating a drug-treatment center and encouraging 18-year-old recovery patients to deal drugs

3    "exploited his vulnerability" and emotional dependence and thus constituted outrageous conduct.[54]

4    Although the panel appraised the tactic as not "the most constructive enforcement method," it

5    concluded it did not "rise to the level of outrageous conduct necessary to constitute a due process

6    violation."[55]   The befriending of adult co-members of a motorcycle club and exploitation of those

7    friendships pales in comparison to the invasion of the sanctity of a treatment facility to encourage

8    recovering addicts to sell drugs.

9

            c.      ***The nature of the crime being pursued and the necessity for the actions***

10                  ***taken in light of the nature of the criminal enterprise at issue***

11           The final consideration in whether government conduct is outrageous is "the need for the

12   investigative technique that was used in light of the challenges of investigating and prosecuting the

13   type of crime being investigated."[56]   Brancato testified that the government was generally

14   investigating the Vagos organization to ferret out criminal activity.[57]   And it was during this

15   investigation that Brancato discovered Halgat and McCall's dangerous criminal propensities.   When

16   _____

17   are common to narcotics enterprises and necessary to create credible cover for undercover agents.").
     Even if the record can be interpreted as Judge Ferenbach sees it to support the notion that Halgat had
18   sworn off drug dealing, the same cannot be said for Halgat's interest in providing armed security for
     drug couriers.   The topic was first broached by Halgat, not Brancato, and the record is devoid of any
19   reluctance by Halgat to continue to provide the type of drug-courier protection services Halgat
     repeatedly bragged about or to participate in the proposed airstrip drug transfer.
20

21   [54] *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991); *see also United States v. Al Kassar*, 660
     F.3d 108, 121 (2d Cir. 2011) ("feigned friendship, cash inducement, and coaching in how to commit
22   the crime do not constitute outrageous conduct"); *United States v. Nations*, 764 F.2d 1073, 1077 (5th
     Cir. 1985) (holding that undercover agent's exploitation of cancer to persuade defendant to assist in
23   the sale of stolen vehicles was not even "improper," let alone "the 'rarest and most outrageous
     circumstances' necessary to require dismissal of an indictment") (quoting *United States v. Yater*, 756
24   F.2d 1058, 1065–66 (5th Cir. 1985)).
25

26   [55] *Smith*, 924 F.2d at 897.

27   [56] *Black*, 733 F.3d at 309.

28   [57] Doc. 283 at 92.

1   the reverse-sting bait was set, they eagerly took it.

2        As the court in *Black* noted, "[t]he reverse sting tactic was designed to avoid . . . risks to the

3   public and law enforcement officers by creating a controlled scenario that unfolds enough to capture

4   persons willing to commit" a dangerous crime.[58]  I cling to no illusion that this airstrip operation took

5   drugs off the street as the government suggests.[59]  The drugs were borrowed from a police evidence

6   vault.  At best, the operation may have prevented the defendants from providing or continuing to

7   provide their armed-protection services in a real-life drug-courier transaction, and it took guns out of

8   the hands of McCall, a convicted felon.  Whether this result was worth the effort the government put

9   into this elaborate ruse, I cannot say.

10        Like the Ninth Circuit panel that recently reversed Judge Otis Wright's outrageous-

11   government-conduct dismissal in *Hudson*, I "question the wisdom of the government's" use of

12   reverse-sting operations, particularly one in which the fake drug transaction is carried out to

13   completion as it was here.[60]  But having considered the totality of circumstances in this case in light

14   of *Black* and the wealth of Ninth Circuit jurisprudence since *Russell*, I cannot conclude that the

15   government's conduct here was "so grossly shocking and so outrageous as to violate the universal

16   sense of justice."[61]  Halgat and McCall's motion to dismiss the indictment for outrageous

17   government conduct is denied.

18       **2.**     **Dismissal under the Court's Supervisory Powers**

19        Halgat and McCall alternatively ask me to exercise my supervisory powers to dismiss the

20   indictment.  A district court may exercise these powers to dismiss an indictment "when the

21   investigatory or prosecutorial process has violated a federal constitutional or statutory right and no

22   lesser remedial action is available," or to preserve judicial integrity.[62]  Defendants argue that this

23   

24   [58] *Black*, 733 F.3d at 309.

25   [59] Doc. 191 at 28.

26   [60] *Dunlap*, 2014 WL 6807733, at *1.

27   [61] *Black*, 733 F.3d at 310 (quoting *Stinson*, 647 F.3d at 1209).

28   [62] *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991).

1     remedy is appropriate because the ATF agent in this case was caught on tape falsifying a September

2     19, 2012, report of the investigation (ROI).[63] Defendants point to a discussion between Brancato and

3     another agent in which Brancato explains what information he plans to record in the ROI that details

4     the purchase of one ounce of cocaine from Wickam through Halgat.[64] Although Brancato had just

5     deposited the purchased drugs in a mailbox for the other agents covertly to retrieve, he tells them he

6     will simply report that he handed over the evidence during debriefing so he doesn't "muddy the

7     waters up." *Id.* Halgat argues—and Magistrate Judge Ferenbach agreed—that this demonstrates that

8     Brancato falsified reports.

9         The evidentiary hearing record, however, belies this characterization. In response to

10    questions from the bench, Brancato explained what he meant by this comment and his approach to

11    preparing his ROIs. Brancato credibly testified that he omitted details about how he transferred

12    evidence to protect covert law-enforcement techniques from disclosure to the public and preserve

13    their use in future investigations.[65]

14         Other minor discrepancies between the audio recording of the drug deal and the summary of

15    it in Brancato's ROI[66] do not suggest falsification. TFO Brancato personally drafted almost 300

16    ROIs during the course of this operation.[67] Some were drafted from memory, others after review of

17    audio or video recordings.[68] Brancato explained that it was "actually impossible as an undercover to

18    immediately write a report about what just happened because" he was "in role."[69] Indeed, he was

19

20    [63] *See* Doc. 188 at 37–39.

21    [64] *Id.* at 38.

22

23    [65] Doc. 284 at 66–67.

24    [66] *See* Doc. 188 at 38 (noting that the ROI states that Halgat told Brancato to get him "on the back
end," but the audio recording suggests it was Brancato who said he would get Halgat on the back

25    end).

26    [67] Doc. 284 at 59–60.

27    [68] *Id.* at 61.

28    [69] Doc. 283 at 105.

1   being surveilled by the Vagos during his eight-month prospecting phase.[70] And information in

2   quotation marks was not necessarily intended to convey a direct quote, but rather the "gist" of

3   something.[71] Even McCall recognizes in his motion that "an ROI is truly simply a summary," not a

4   verbatim record of events.[72] I do not find the discrepancies that defendants identify to be material, let

5   alone evidence of a violation of a constitutional or statutory right that justifies dismissal of the

6   indictment.

7                                  **Conclusion**

8           Accordingly, IT IS HEREBY ORDERED that the parties' stipulation **(Doc. 277) is**

9   **approved**, and Defendants' Motions to Dismiss for Outrageous Government Conduct and/or

10  Pursuant to the Court's Supervisory Powers **(Doc. 188 & 205) are DENIED**.

11          DATED January 2, 2015.

13                                          _____
14                                          Jennifer A. Dorsey
                                            United States District Judge

26  [70] *Id.* at 108.

27  [71] Doc. 284 at 61.

28  [72] Doc. 205 at 3.

Page 20 of 20

# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:13-CR-00241-APG-VCF |
| Plaintiff, | **ORDER REJECTING REPORT & RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| JEREMY HALGAT, et al., | (Dkt. ##59, 108) |
| Defendants. | |

The Government successfully infiltrated the Vagos Motorcycle Club to determine whether it was engaged in illegal conduct. Defendant Jeremy Halgat was a member of the Vagos. At the conclusion of the investigation, Halgat was indicted in this case on four counts of distribution of cocaine and one count of conspiracy to distribute. (Dkt. #1.)[1] Halgat moved to dismiss the indictment, alleging that it was the result of "Outrageous Government Conduct."[2] (Dkt. ##59, 93.) Halgat contends that he was not predisposed to commit the crimes and that the Government's agent created and encouraged the crimes, bullied Halgat into participating, and oversaw the crimes from start to finish. The evidence presented at the hearing on the motion refutes Halgat's

---

[1]  Halgat also was indicted in Case No. 2:13-cr-00239-JAD-PAL in connection with a reverse sting operation created during the same investigation of the Vagos. Halgat filed nearly-identical motions to dismiss in both cases. Thus, Judge Dorsey and I held a joint evidentiary hearing on the motions. (*See* Dkt. #132.)

[2]  During the evidentiary hearing on the motion, Halgat stipulated to withdraw the portion of his motion alleging the Government purposely edited or tampered with the audio recordings. (Dkt. #171 at 5-11.) I hereby approve the parties' written stipulation (Dkt. #164) withdrawing that portion of the motion.

allegations and demonstrates both that Halgat was a willing participant in the drug purchases and that the Government's actions were reasonable. Therefore, I deny Halgat's motion.[3]

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The Government's "Operation Pure Luck" was designed to infiltrate the Vagos Motorcycle Club and determine whether it was a criminal enterprise and whether its members were engaging in criminal activity. Agostino Brancato was a Los Angeles County Sheriff's Deputy and Bureau of Alcohol, Tobacco, Firearms and Explosives Task Force Officer (TFO). In approximately September of 2011, Brancato joined the Vagos in Las Vegas, acting in an undercover capacity. (Dkt. #168 at 41.) It took him until July 1, 2012 to progress through the Vagos ranks from "Hang Around" status, through "Prospect" status, to become a "Full-Patch Member." (*Id.* at 41-42.)

Defendant Jeremy Halgat was a Full-Patch Member of Vagos, and he held a leadership role within Vagos.[4] Brancato became friendly with Halgat and his family and regularly interacted with Halgat and other Vagos members. Although Halgat had no documented criminal history (Dkt. #168 at 42-43), he repeatedly bragged to Brancato about his prior criminal exploits, including stomping a Hell's Angels member in Sparks, Nevada (Dkt. #170 at 122-123), attempting to assault members of rival motorcycle clubs (*Id.* at 119-120), firing a weapon in the backyard of a New Year's Eve party (Dkt. #170 at 121), transporting marijuana and live grenades across the Mexican border (*Id.* at 125, 129-130), and having $35,000 worth of marijuana stolen from him (*Id.*). Halgat claimed that "he had a couple of close calls with law enforcement during his previous work as a drug courier." (*Id.*) He told Brancato that he could convert assault rifles into fully-automatic weapons. (*Id.* at 136-137.) Halgat wore Vagos patches signifying that he had

---

[3] I express no opinion about the Government's actions in connection with the "street theater" portion of Operation Pure Luck, as those events are unrelated to the Indictment in this case. Rather, they are part of Judge Dorsey's case.

[4] At some point during the operation, Halgat was demoted from a Full-Patch Member to a Prospect.

2

committed violence on behalf of both his Vagos chapter and the overall Vagos organization (Dkt. #170 at 116-118, Dkt. #169 at 9-10), thereby corroborating some of his boasts.

Brancato witnessed Halgat committing criminal activity, including the purchase, distribution, and consumption of narcotics. (Dkt. #170 at 109, 111-112, 41-143, 146-152.) Brancato was with Halgat when Halgat purchased cocaine from defendant Udell Wickham. (Dkt. #170 at 109, 141-143.) Brancato ultimately determined that Halgat had a criminal disposition, and Brancato wanted to trace Halgat's drug supply chain higher up past Wickham. (Dkt. #170 at 156; Dkt. #171 at 63-65.)

Brancato asked Halgat how he could purchase a quarter pound of cocaine from Wickham. Halgat expressed concern about actively participating in the transaction, but he agreed to make introductions between Brancato and Wickham and vouch for each of them. (Dkt. #168 at 104-114; *see also*, Defs. Exh. 619 and 697 (audio tapes); Defs. Demonstrative Exh. 586 at 5-6; Govt. Demonstrative Exh. 5 at 60-61.) Within the next few weeks, Halgat arranged for a meeting with Wickham on September 11, 2012 at the Crowbar. At that meeting, after some small talk between the three men, Halgat and Wickham went to another spot in the Crowbar and negotiated the purchase of a quarter pound of cocaine for $2,800 on a future date. (Dkt. #170 at 157-159.)

On September 19, 2012, Halgat informed Brancato that Wickham required the entire $2,800 purchase price paid in advance. (Dkt. #170 at 158-166.) Brancato was unwilling to front that much cash, so he asked to purchase a smaller amount that day. (*Id.*) Halgat relayed the message to Wickham and Wickham agreed. (*Id.*) Later that evening, Brancato and Halgat drove together to a Hooters restaurant where Halgat had arranged with Wickham to conduct the sale. (*Id.* at 166-167.) While driving to the restaurant, Brancato gave $800 to Halgat for the purchase. At the restaurant, the three discussed purchasing a quarter pound of cocaine in the future, and Wickham agreed to sell an ounce for $700 that day. (*Id.*; *see also* Exh. 620 (audio recording).) Eventually, Halgat and Wickham went to the restroom and exchanged the money for an ounce of cocaine. (*Id.*) Halgat gave Brancato the cocaine during the drive home. (Dkt. #168 at 134-137.)

Halgat and Brancato made three more one-ounce purchases of cocaine from Wickham on October 11, 12, and 26, 2012. Each time, Halgat was an active participant in the transactions, handing over the money and/or accepting the cocaine. During this time, Brancato repeatedly asked Halgat if he could deal directly with Wickham. (Dkt. #171 at 63-65.) Halgat never allowed that to happen, so Halgat was directly involved in all four purchases. (*Id.*)

Operation Pure Luck continued for months after these four purchases and resulted in several indictments. In this case, Halgat and Wickham were indicted on four counts of distribution of cocaine and one count of conspiracy to distribute. Wickham pleaded guilty to all five counts without the benefit of a plea agreement with the Government. (Dkt. #80.) Halgat moved to dismiss the indictment, alleging "Outrageous Government Conduct." After the motion was fully-briefed, Magistrate Judge Ferenbach recommended that the motion be granted. (Dkt #108.) The Government objected to that recommendation. (Dkt. #114.)

Pursuant to Local Rule IB 3-2, I have conducted a *de novo* review of the issues set forth in Magistrate Judge Ferenbach's Report & Recommendation and the related briefs. In connection with that review, I and Judge Dorsey convened a joint evidentiary hearing on the motions filed in this case and in the related Case No. 2:13-cr-00239-JAD-PAL. For the reasons set forth herein, Magistrate Judge Ferenbach's Report & Recommendation is rejected, and Halgat's Motion to Dismiss is denied.

## ANALYSIS

### 1. The Bases for Magistrate Judge Ferenbach's Recommendation

Magistrate Judge Ferenbach's recommendation of dismissal is based in large measure on his findings that (1) Halgat had repudiated his prior drug-dealing activities and refused to participate in the drug transactions, (2) Brancato unduly pressured Halgat into participating, and (3) Brancato lied in at least one Report of Investigation. (Dkt. #108 at 6-10 & 21, n.15.) Magistrate Judge Ferenbach's findings were made without the benefit of an evidentiary hearing. He initially scheduled a hearing but canceled it after the Government—apparently overly optimistic about its position—stated in its response to the motion that "arguments raised in

4

1  [Halgat's] motion do not rise to the level of necessitating an evidentiary hearing as there is no

2  contested issue of fact." (Dkt. #103 at 36:5-7.)  Magistrate Judge Ferenbach interpreted the facts

3  and allegations differently than the Government, and he believed the Government conceded that

4  "Halgat's refusal to traffic cocaine [with Brancato] was real." (Dkt. #108 at 30, n. 20.)

5       Instead of an evidentiary hearing, Magistrate Judge Ferenbach relied on transcripts of

6  video and audio tapes that were submitted by Halgat's expert.  The Government submitted

7  transcripts that differed from Halgat's, but Magistrate Judge Ferenbach accepted Halgat's

8  versions as correct and that affected his decision.  Magistrate Judge Ferenbach found that Halgat

9  initially refused to help Brancato purchase cocaine because Halgat had unequivocally repudiated

10  his prior drug dealing activities. (*Id.* at 7-9 & 20.)  Magistrate Judge Ferenbach also found

11  Brancato's repeated pressure upon Halgat over five weeks overcame Halgat's initial refusal. (*Id.*

12  at 10.)

13       At the evidentiary hearing, the parties played audio and video recordings of the relevant

14  events and offered their differing transcripts of those recordings.  Many of the recordings are of

15  poor quality and difficult to decipher.  Halgat's transcripts misidentify speakers and misquote

16  what is being said. (*Compare* Defs. Demonstrative Exh. 586 at 5-6 *with* Dkt. #168 at 104-114,

17  124, 128, 142-143 *and with* Dkt. #170 at 41-43.)  More importantly, Halgat's claim that he

18  refused to participate in the sale because he had repudiated his former drug dealing is belied by

19  the evidence presented at the hearing, including the recordings and the transcripts.  For instance,

20  while discussing the possibility of working with Brancato to purchase the quarter pound of

21  cocaine, Halgat stated:

22       I did this for a long time, and I used up all my luck.  I know that for a fact, so the
         only thing I can contribute is, hey this my home boy, I trust him.  This is my home
23       boy, I trust him, whatever you do, . . . . It's trust – understand.

24  (Dkt. #168 at 104-114; *see also*, Defs. Exh. 619 & 697 (audio tapes); Defs. Demonstrative Exh.

25  586 at 5-6; Govt. Demonstrative Exh. 5 at 60-61.)  Rather than refusing to assist in the drug sale,

26  Halgat agreed to assist by making an introduction between Brancato and Wickham and vouching

27

28

for both of them to each other. (*Id.* ("the only thing I can contribute is, hey this is my home boy, I trust him").)

According to Halgat's transcript, Halgat next said "I can't fucking. I can't help. . . ." (Defs. Demonstrative Exh. 586 at 6.) The Government's transcript is slightly different, with Halgat saying "I can't (unintelligible). I can't have . . . ." (Govt. Demonstrative Exh. 5 at 61.) Brancato repeatedly testified that Halgat's transcript is incorrect. (Dkt. #168 at 114, 124, 128, 142-143.) He specifically testified that this portion is inaccurate and that Halgat never said "I can't help." (*Id.* at 142-144.) The recording is difficult to hear, but it appears to match the Government's version. (*See* Defs. Exhs. 619 & 697 (audio tapes).) The Government's interpretation also seems more logical, especially in the context of the overall conversation. Seconds before, Halgat had offered to make introductions and vouch for Brancato and Wickham, so he would not have immediately thereafter said "I can't help." Rather, it appears Halgat was telling Brancato that he would not be directly involved in the purchase of a quarter pound of cocaine, but that he would facilitate by vouching for the two participants he knew: Brancato and Wickham.[5]

While I believe the Government's transcripts are more accurate than Halgat's, for purposes of this motion the differences are not critical because in both transcripts Halgat agreed from the outset to assist the purchase through introductions and vouching. Subsequently, Halgat went further by fully participating in the transactions. He also rejected several opportunities to remove himself from the criminal activities when he refused to allow Brancato to contact and purchase directly from Wickham.

Magistrate Judge Ferenbach also found that Brancato falsified portions of his Report of Investigation about the first drug transaction. (*Id.* at 21, n.15.) Again, he made this finding

---

[5] This is consistent with Halgat's statement a few seconds later that during his prior drug dealing, he grew tired of being used as "a pistol" and a "bomb" for higher ups. (Defs. Demonstrative Exh. 586 at 6, Govt. Demonstrative Exh. 5 at 62.) Thus, while he may have not wanted to be an active participant in the sale of a large amount of cocaine, he apparently was willing to facilitate Brancato's purchase through introductions and vouching.

without the benefit of an evidentiary hearing, and that affected his decision. At the evidentiary hearing that was ultimately convened, Brancato offered credible explanations for the perceived contradictions and issues that Magistrate Judge Ferenbach found "distressing." (*See, e.g.*, Dkt. #171 at 63-68.) He also rebutted Halgat's allegation that the report was falsified. (*Id.*)

The benefit of the evidentiary hearing to resolving these issues cannot be understated. I was able to compare the transcripts with the recordings, listen to Brancato's explanations, evaluate his demeanor while testifying, and weigh his credibility. "There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995). *See also United States v. Thoms*, 684 F.3d 893, 904 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 1477, 185 L. Ed. 2d 366 (2013) ("The strong presumption in our system is that demeanor evidence has important value. . . . Put another way, before a district court calls a police officer a liar, there is a strong presumption that the judge should look him in the eye first.").

I found Brancato's testimony to be truthful. His explanations of the issues that concerned Magistrate Judge Ferenbach made sense in the context of this case. Had the Government not argued in its response that there were no issues of disputed fact, Magistrate Judge Ferenbach likely would have conducted an evidentiary hearing. Instead, his Report & Recommendation is based on unsupported allegations of falsification and Halgat's faulty transcripts of recordings. Ultimately, it is up to the jury to decide who said what during the recorded conversations, whether Brancato is credible, and whether Halgat actually and voluntarily participated in the drug transactions for which he has been indicted. At this stage, I find the Government's transcripts to be more accurate and Brancato's testimony at the hearing to be reliable.

## 2. Outrageous Government Conduct

The notion that an indictment can be dismissed for outrageous government conduct is rooted in the due process clause of the Fifth Amendment of the Constitution, which provides that "no person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. Outrageous government conduct occurs when the actions of law enforcement

1    officers or informants are "so outrageous that due process principles would absolutely bar the

2    government from invoking judicial processes to obtain a conviction." *United States v. Russell*,

3    411 U.S. 423, 431-32 (1973).

4            Dismissal for outrageous government conduct is "limited to extreme cases" in which the

5    defendant can demonstrate that the government's conduct "violates fundamental fairness" and is

6    "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States*

7    *v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011). This is an "extremely high standard." *United*

8    *States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citing *United States v. Garza-Juarez*, 992 F.2d

9    896, 904 (9th Cir. 1993)); *United States v. Simpson*, 813 F.2d 1462, 1465 (9th Cir. 1987) (quoting

10   *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir. 1986)) (finding that outrageous

11   government conduct exists only in "'that slim category of cases in which the police have been

12   brutal, employing physical or psychological coercion against the defendant'")). The standard is

13   so high that only two federal appellate decisions have reversed convictions for outrageous

14   government conduct. *Black*, 733 F.3d at 302 (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir.

15   1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)).

16           Each case must be decided on its own facts, but outrageous government conduct occurs

17   when "government agents . . . 'engineer[] and direct[] a criminal enterprise from start to finish.'"

18   *Black*, 733 F.3d at 302 (quoting *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008)).

19   Similarly, the government acts outrageously when it uses "'excessive physical or mental

20   coercion' to convince an individual to commit a crime," (*Id.* at 302 (quoting *United States v.*

21   *McClelland*, 72 F.3d 717, 721 (9th Cir. 1995))), or when the government generates "'new crimes

22   merely for the sake of pressing criminal charges.'" *Id.* at 302 (quoting *United States v. Emmert*,

23   829 F.2d 805, 812 (9th Cir. 1987)).

24           On the other hand, it is not *per se* outrageous for law enforcement to infiltrate a criminal

25   organization, approach people who are already involved in or contemplating a criminal act, or

26   provide necessary items to a conspiracy. *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985).

27   Nor is it necessarily outrageous for the government to "use artifice and stratagem to ferret out

28

criminal activity." *United States v. Bogart*, 729 F.2d 1428, 1438 (9th Cir. 1986). "Government agents often need to play the role of criminals in order to apprehend criminals, and this role occasionally entails unseemly behavior." *United States v. Mosley,* 965 F.2d 906, 910 (10th Cir. 1992).

In *Black*, the Ninth Circuit reviewed prior case law and

> identified [the following] factors as relevant to whether the government's conduct was outrageous: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

733 F.3d at 303.

## A. Halgat's Known Criminal Characteristics and the Government's Individualized Suspicion of Halgat

These first two factors are closely tied together. Halgat had no criminal record and held a concealed firearm permit. However, he was a Full-Patch Member of, and held leadership positions in, the Vagos club. Halgat repeatedly bragged to Brancato about his prior criminal exploits, including stomping a Hells Angel member in Sparks, Nevada (*Id.* at 122-123), firing a gun at a New Year's Eve party (Dkt. #170 at 121), transporting marijuana and live grenades across the Mexican border (*Id.* at 129-130), having $35,000 worth of marijuana stolen from him (*Id.*), and that "he had a couple of close calls with law enforcement during his previous work as a drug courier." (*Id.*) Brancato witnessed Halgat commit crimes, including purchasing, distributing, and ingesting cocaine. Halgat wore Vagos patches signifying he had engaged in violence on behalf of both his Vagos chapter and the overall Vagos organization (Dkt. #170 at 116-118, Dkt. #169 at 9-10), thereby corroborating his bragging. These two factors weigh in the Government's favor.

## B. The Government's Role in Creating the Crimes and its Encouragement of Halgat to Commit Them

The third *Black* factor examines whether the "government approached the defendant initially or the defendant approached a government agent, and whether the government proposed

the criminal enterprise or merely attached itself to one that was already established." 733 F.3d at 305. The "infiltration of drug rings and a limited participation in their unlawful present practices . . . is a recognized and permissible means of investigation." *Russell*, 411 U.S. at 432.

The fourth *Black* factor focuses on the "extent to which the government encouraged a defendant to participate in the charged conduct," with "mere encouragement being of lesser concern than pressure or coercion." 733 F.3d at 308. Courts have tolerated the government's use of friendship, sympathy, and even sexual foreplay to win a suspect's confidence. (*See* Dkt. #108 at 27-28 and cases cited therein.)

In *Black*, the government proposed a fictional stash-house robbery and initiated contact with the defendants. 733 F.3d at 307. The defendants responded positively and helped plan the details of the robbery. *Id.* at 305. Despite the government's initial role in creating the crime and assisting with its commission, the Ninth Circuit recognized that the defendants joined the conspiracy without significant inducement and took a role in planning the crime; thus, this factor did not weigh against the government. *Id.*

Magistrate Judge Ferenbach found no evidence in the record that Halgat planned and guided the cocaine purchases. Rather, he believes that Brancato pressured Halgat over five weeks to overcome Halgat's initial protestations against the purchases. (Dkt. #108 at 24-26.) As detailed above, Magistrate Judge Ferenbach's decision is based in large part on Halgat's transcripts of the relevant tapes—transcripts that contain numerous errors, including misidentifying speakers, and that are not as reliable as the evidence presented at the evidentiary hearing. At the hearing, Brancato credibly explained what was happening during the recordings, and clarified who was speaking and what was said. His explanations and the Government's transcripts match the audio recordings much better than Halgat's proffered transcripts.

Brancato had previously watched Halgat purchase cocaine from Wickham, and he asked to do the same thing. For the crimes at issue in this case, the government did not stage an elaborate ruse. Brancato began asking Halgat whether he, too, could purchase cocaine from Wickham. While Halgat initially expressed some concerns about the purchase, he did not

1  strenuously oppose it. Instead, he agreed to make introductions and vouch for both Brancato and

2  Wickham. *See supra* at 3, 5-7. Contrary to the story Halgat attempts to tell from the erroneous

3  transcripts, Halgat quickly became a willing participant. He arranged the meetings with

4  Wickham. He accompanied Brancato to each purchase. And he conducted the exchanges.

5  Moreover, Halgat had several opportunities to remove himself from the crimes. For instance,

6  Brancato repeatedly asked to deal directly with Wickham, but Halgat ignored those requests and

7  continued to remain involved, in a sense controlling the relationship. This confirms that Halgat

8  was a willing participant, as he easily could have stepped aside.

9      Most importantly, Halgat presented no evidence to show that Brancato unduly pressured

10  him—let alone did anything outrageous—to convince him to participate in the transactions.

11  Brancato asked Halgat to help him with the drug purchase at least twice on August 10, 2012 and

12  apparently a few times before the September 19 purchase. But there is no evidence that Brancato

13  exerted heavy pressure upon Halgat or coerced him into participating. Rather, it appears that

14  Brancato raised the issue, Halgat agreed to make introductions, and Halgat eventually decided to

15  take the bait and involve himself in the transactions. There is nothing outrageous about such

16  conduct. Based on the evidence presented at the hearing, Brancato's encouragement of Halgat in

17  connection with the four drug transactions involving Wickham was not outrageous.

### C. The Nature of the Government's Participation in the Offense Conduct, the Nature of the Crime Being Pursued, and the Necessity for the Actions Taken in Light of the Nature of the Criminal Enterprise at Issue

20      The fifth and sixth *Black* factors examine the Government's participation in the crime,

21  particularly: (1) the "duration of the government's participation in [the] criminal enterprise," (2)

22  the "nature of the government's participation—whether the government acted as a partner in the

23  criminal activity, or more as an observer of the defendant's criminal conduct—including any

24  particularly offensive conduct taken by the government during the course of the operation," (3)

25  "the necessity of the government's participation in the criminal enterprise—whether the

26  defendant would have had the technical expertise or resources necessary to commit such a crime

27  without the government's intervention," and (4) the "need for the investigative technique that was

28  

11

1    used in light of the challenges of investigating and prosecuting the type of crime being

2    investigated." *Black*, 733 F.3d at 308-309.

3         Brancato's infiltration of the Vagos took place over 22 months (August 2011- June 2013).

4    This was not an unduly lengthy period, given the closed nature of the Vagos club and how long it

5    takes for applicants to proceed through the screening process before becoming Full-Patch

6    Members. (Dkt. #170 at 97, 102-105, 107-108.)  No specific evidence was presented that

7    Brancato's activities prior to the four drug transactions with Halgat were improper or outrageous.

8    With regard to the drug purchases, Brancato first proposed purchasing cocaine in August 2012,

9    and the purchases occurred between September 19 and October 26, 2012.  This is a relatively

10   short period.

11        Brancato's participation in the purchases was not outrageous.  He requested the drugs and

12   provided the funds, but Halgat contacted Wickham and made the arrangements each time.  When

13   the government agent is "simply a purchaser or transmitter of contraband otherwise destined for

14   the market place," the government should not be held to have committed outrageous government

15   conduct. *United States v. Stenberg*, 803 F.2d 422, 431 (9th Cir. 1986).  These were simple

16   cocaine purchases similar to the purchases Halgat previously made from Wickham.

17        Similarly, the Government did not supply Halgat with technical expertise or resources he

18   did not already have.  Halgat had a pre-existing relationship with Wickham to obtain drugs, and

19   Brancato simply supplied the funds and opportunity to sell.

20        Finally, the techniques used by Brancato were reasonable in light of the investigation of

21   the Vagos club.  The Vagos club is a closed society in which entry is tightly guarded and

22   applicants are screened, investigated, and monitored over a lengthy period of time.  Brancato had

23   to become a Full-Patch Member of the Vagos to thoroughly investigate its activities.  Brancato's

24   actions were reasonable and necessary to infiltrate the Vagos.  With regard to the four drug

25   purchases, the techniques he employed were not unusual or overly sophisticated: he asked Halgat

26   to help him purchase drugs and he provided the funds.

27

28

The facts of this case are far less egregious than those in *Black*. The Government did not manufacture the crimes nor direct the criminal activities from start to finish. Brancato asked and encouraged Halgat to assist him in purchasing cocaine. Despite expressing some initial concerns, Halgat readily agreed to make introductions and vouch for Brancato and Wickham. Ultimately, Halgat both arranged and participated in the four drug purchases. He also resisted the opportunities to remove himself from the transactions and allow Brancato to deal directly with Wickham. There is no evidence that Brancato unduly pressured Halgat to become—or remain—involved.

Ultimately, it is up to the jury to decide who said what during the recorded conversations and whether Halgat actually and voluntarily participated in the drug transactions for which he has been indicted. At this stage, the evidence presented during the hearing on Halgat's motion convinces me that the Government did not engage in outrageous conduct. Considering all of the *Black* factors, the totality of the circumstances of this case does not warrant dismissal for outrageous government conduct.

### 3. The Court's Supervisory Powers

As an alternative to dismissing the indictment for outrageous government conduct, Halgat requests dismissal pursuant to my supervisory powers as a federal district judge. A judge may dismiss an indictment under his supervisory powers where: (1) the government violated a defendant's recognized right; (2) the government engaged in illegal conduct that must be deterred; or (3) there is evidence that a jury's verdict rested upon inappropriate considerations. *Black*, 733 F.3d at 310 n.12 (citing *United States v. Ramirez*, 710 F.2d 535, 541 (9th Cir. 1983)). The supervisory power "is commonly viewed as an inherent power to preserve the integrity of the judicial process." *Ramirez*, 710 F.2d at 541. "The power, however, has been infrequently utilized, . . . and a dismissal should be granted only when there is a clear basis in fact and law for doing so." *Id.* (citations omitted). Halgat has not established that the Government violated a recognized Constitutional or statutory right or engaged in any illegal conduct that must be deterred. Thus, dismissal under my supervisory powers is not warranted.

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CONCLUSION

**IT IS HEREBY ORDERED** that the Magistrate Judge's Report & Recommendation (Dkt. #108) is rejected.  The parties' stipulation (Dkt. #164) is approved.  Halgat's Motion to Dismiss (Dkt. #59) and Supplement (Dkt. #93) are **DENIED**.

Dated this 2nd day of January, 2015.

_____

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

14